UNITED STATES of America, Appellee,

v.

Louis M. NEWTON, Appellant.

No. 85–1296.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 14, 1985.

Decided April 22, 1986.

J. Earlene Farr, Kansas City, Mo., for appellant.

J. Daniel Stewart, Asst. U.S. Atty., Kansas City, Mo., for appellee.

Before LAY, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and FAGG, Circuit Judge.

FAGG, Circuit Judge.

Louis M. Newton appeals from his convictions for aiding and assisting the escape of a federal prisoner, 18 U.S.C. § 752; har-

boring and concealing an escaped federal prisoner, 18 U.S.C. § 1072; and two counts of possessing an unregistered firearm, 26 U.S.C. §§ 5861(d), 5871. We affirm.

On September 12, 1984, a Denver County Deputy Sheriff was returning a handcuffed federal prisoner, James Quintana, to Leavenworth when four men armed with shotguns forced his car off the road. The men drove away in the deputy sheriff's rental car which contained his revolver, police manuals, and some personal belongings. The deputy sheriff reported that the driver of the escape car, whom he later identified as Newton, wore heavy makeup on his face. Furthermore, the United States Marshals Service learned that the men may have used a red rotating light, similar to those used on unmarked police cars, in the escape.

The Marshals Service's search for Quintana quickly led them to a house in Kansas City that Newton was renting. Although they had an arrest warrant for Quintana, the Marshals Service obtained a search warrant authorizing the search of Newton's house for Quintana. In addition, the Marshals Service and the local police support unit (PSU) encircled the house.

After they received the search warrant, the officers began negotiating with Quintana for the peaceful surrender of all the occupants of the house. The officers believed from their surveillance that a woman and four men, including Quintana, were in the house. Thus, when a woman and two men, one of whom was Newton, surrendered, the officers thought that one man other than Quintana remained in the house.

During the period of negotiations the officers learned from Newton and Quintana that weapons and explosives were in the house. The officers did not interrupt their efforts to apprehend Quintana in order to update their search warrant to include these items. Instead they continued to keep the house surrounded and to negotiate with Quintana for his peaceful surrender.

When it became apparent, however, that Quintana was not going to surrender, the PSU entered the house to capture him. While searching for Quintana, the PSU observed various firearms lying in the open, including the machine gun and the molotov cocktails that later formed the basis of the counts against Newton of possessing unregistered firearms. Upon finding Quintana's body in a hallway with a pistol lying nearby, the PSU searched the entire house looking only in areas in which a person could be hiding. On this protective search a member of the PSU saw handcuffs on the floor of one of the bedrooms.

Following the PSU's search, the police bomb squad entered the house to locate and deactivate the explosives which, due to Quintana's statements and the PSU's observations, were believed to be inside. The bomb squad x-rayed a briefcase they thought might contain explosives. Because the x-ray revealed cylindrical vials consistent in shape with certain types of explosives, the briefcase was opened, and the vials were discovered to be part of a makeup kit.

After the house was secured by the PSU and the bomb squad, Inspector Harp of the Marshals Service entered to identify Quintana's body. Clearly visible to Harp on her path to the body were items of evidence lying in the living room, in the open living room closet, in the dining area, and in the kitchen. These items included several boxes of ammunition, three revolvers, one of which belonged to the deputy sheriff, a shotgun, a machine gun, molotov cocktails, a red rotating light, a programmable radio scanner tuned to police frequencies, the deputy sheriff's police manual, a deputy badge not belonging to the deputy sheriff, and a shoulder holster.

Before trial Newton moved to suppress the evidence seized from his home. This motion was denied with respect to the evidence described above, including the handcuffs, the briefcase, and the makeup kit. Following a jury trial, Newton was convicted on all four counts of the indictment.

On appeal, Newton's principal argument is that his motion to suppress should have

been granted. The government contends that the seizure of the evidence was lawful . under the plain view doctrine. We agree.

■ Under the plain view doctrine, seizure of evidence without a warrant is permissible if the officers are lawfully in a position to view the evidence, the discovery of the evidence is inadvertent, and the incriminating nature of the evidence is immediately apparent. *United States v. Strand,* 761 F.2d 449, 454 (8th Cir.1985); *United States v. Robinson,* 756 F.2d 56, 60 (8th Cir.1985). All three requirements of the doctrine were met in this case.

■ Newton does not argue that the evidence was not visible to the officers as they conducted their searches. Rather, he argues that the first requirement of the plain view doctrine was not satisfied because the officers were not lawfully in a position to see the evidence. His arguments on this point are without merit.

First, the PSU clearly had the authority under the search warrant to enter the house. They also were justified in conducting the protective search for the man officers thought was still inside and who might have been the cause of Quintana's death. *See United States v. Whitten,* 706 F.2d 1000, 1014 (9th Cir.1983) (A protective search is lawful if officers have a reasonable belief based on specific and articulable facts that dangerous persons may be in the area.), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984); *see also United States v. Hill,* 730 F.2d 1163, 1169–70 (8th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 255, 83 L.Ed.2d 192 (1985). Second, based on Quintana's statements and the PSU's observations, exigent circumstances warranted the bomb squad's search of the potentially dangerous brief case. Third, Inspector Harp's entry into the house to identify Quintana was authorized under the search warrant.

■ Newton argues that the discovery of the weapons and explosives in the house was not inadvertent because the officers knew of their presence before they entered the house. Significantly, however, Newton does not contend that the Marshals Service had probable cause to believe they would find these items in the house at the time they applied for and received the search warrant. Nor does he argue that the search warrant for Quintana was a subterfuge to gather evidence against Newton or the other occupants of the house. Instead, Newton argues that once he and Quintana told the officers about the weapons and explosives, the officers had an obligation to update the warrant to include these items. According to Newton, the officers' failure to update the warrant despite the fact that they had ample time in which to do so renders the weapons and explosives inadmissible. We disagree.

The purpose of the inadvertency requirement is to prevent the premeditated seizure of items not listed in the warrant. *See United States v. $10,000 in United States Currency,* 780 F.2d 213, 218 (2d Cir.1986). The inadvertency requirement is not met "[w]here the police 'know in advance' that certain evidence is present and intend to seize it, yet fail to particularize it in their warrant application." *Id.* (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 471, 91 S.Ct. 2022, 2040–41, 29 L.Ed.2d 564 (1971)). Even Newton does not contend that we are presented with this situation.

Indeed, had the officers immediately and forcibly executed the search warrant, the discovery of the evidence would have been inadvertent. When a delay in executing a warrant is motivated by a desire to avoid bloodshed, it would be counterproductive to impose an obligation on the officers to inform a magistrate as to each new piece of information they receive during the delay. In these circumstances such an obligation would serve only to thwart effective police work and would not further the purpose of the inadvertency requirement.

Thus, although it is possible to determine in hindsight that there was time to update the warrant, the officers' actions in this case were not at odds with the purposes of the inadvertency requirement, and their

failure to update the search warrant does not render the weapons and explosives inadmissible.

The last requirement of the plain view doctrine is that the incriminating nature of the evidence be immediately apparent. This requirement is satisfied if there is "probable cause to associate the property [seized] with criminal activity." *Texas v. Brown*, 460 U.S. 730, 741–42, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983); *see United States v. Pajari*, 715 F.2d 1378, 1384 (8th Cir.1983). In determining whether this requirement is met, we may consider the collective knowledge of the officers executing the searches. *United States v. Wright*, 641 F.2d 602, 606 (8th Cir.), *cert. denied*, 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981); *see also United States v. Johnston*, 784 F.2d 416, 420 (1st Cir. 1986). Since Inspector Harp was familiar with the facts surrounding the escape, she could associate with criminal activity each item of evidence observed during the searches of the house, and thus this requirement has been satisfied.

Because the seizure of the evidence admitted at trial was lawful under the plain view doctrine, we affirm the district court's denial of the motion to suppress these items.

Newton raises four other arguments on appeal: (1) his confession was involuntary despite his receipt and waiver of two separate sets of *Miranda* warnings; (2) the district court abused its discretion in admitting a videotape of the lineup from which the deputy sheriff identified Newton as the driver of the escape car; (3) the district court abused its discretion in excluding statements Quintana made to officials during the negotiations; and (4) the evidence was insufficient to convict him on all four counts of the indictment.

We have considered these arguments and find them to be without merit.

Affirmed.