**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0594n.06

**No. 08-5851**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Aug 21, 2009**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **ON APPEAL** FROM THE |
| **Plaintiff-Appellant,** | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| JAMES EDWARD ESTES, | ) | |
| | ) | **O P I N I O N** |
| **Defendant-Appellant.** | ) | |

**BEFORE: NORRIS AND COLE, Circuit Judges; ADAMS, District Judge.**[*]

**ALAN E. NORRIS, Circuit Judge.** Defendant James Edward Estes appeals the denial of

his motion to suppress. After the motion was denied, he entered into a guilty plea to a one-count

indictment charging him with being a felon in possession of a firearm. 18 U.S.C. § 922(g). The plea

agreement preserved the right to appeal the district court's decision, which we now affirm.

On the evening of June 7, 2007, Holly Crowder called the Jackson, Tennessee, police

department and reported that she had been assaulted at the defendant's home at 200 Person Street.

According to Rodney Anderson, the first officer to reach her, Crowder told him that "she went to Mr.

Estes' house to get high and that he attempted to rape her when she was trying to leave and . . . she

kicked out the window to get out of his house." Anderson accompanied Crowder to defendant's

residence where they were joined by other officers.

---

[*]The Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sitting by
designation.

Crowder pointed out her car in defendant's driveway where she left it in her hurry to escape. Anderson testified that he noticed a window had been broken, confirming what he had been told by Crowder. He then knocked on the door and was met by defendant who explained that his son had "gott[en] into it" with his girlfriend and that the two of them had broken the window before leaving.

After Crowder identified defendant as the person who assaulted her, Anderson placed him under arrest and locked him in the back of a patrol car. The officers then engaged in what they characterized as a "protective sweep" of the residence. During the sweep, an officer noticed a "little Derringer" on a nightstand next to the bed. Crowder accompanied the officers inside in order to try to locate certain personal items – car keys and a cell phone – that she claimed defendant had taken from her. These items were later found in her car.

Although the testimony presented during the suppression hearing was not entirely consistent, at some point officer Anderson and officer Christopher Falacho entered the yard of the house to look around. Falacho took photographs of the residence and, after the protective sweep, he noticed a tray containing drug-related items on the ground behind a wheel of defendant's car, which was parked in the driveway and visible from the alley.

After all of this had occurred, narcotics investigator Wes Stilwell arrived and he prepared an application for a search warrant, which included his own affidavit. The affidavit states in part as follows:

> When JPD officers arrived on the scene to make contact and detain Estes, officers observed in plain view a small Derringer type handgun in Estes' bedroom during a security check [of] the residence after Estes stated that his son had been at the residence. Officers also found marijuana, cocaine packaged in multiple separate baggies, oxycontin, drug paraphernalia and a State of Tennessee cosmetology license

issued to James Estes with the illegal drugs that was [sic] concealed outside the residence under Mr. Estes' vehicle. Mr. Estes, by his own voluntary admission served a 12 year sentence for drug crimes and was released in 2000.

The warrant authorized officers to search the residence for items related to drug trafficking; it did not mention firearms.

After obtaining the warrant, the officers searched the house and seized the handgun seen by the officers earlier. They also found other guns, marijuana, and prescription medication.

At the conclusion of the suppression hearing, the district court gave an oral ruling, which concluded that the evidence was "insufficient to justify a conclusion that the officers thought someone else was in the house." Hence, they could not rely on the "public safety" exception to the warrant requirement for their protective sweep. Second, it held that the government's contention that the officers could enter defendant's home under the "community caretaker exception" was misplaced. Although the victim had personal items in defendant's house, more was needed for them to conduct a warrantless search. Because neither exception to the warrant requirement applied, the officers' sighting of a pistol "in plain view" while inside the house could not be used to establish probable cause for a warrant.

Despite this fact, the district court denied the motion to suppress on these grounds:

> The Court finds that even if we excise the reference in the affidavit to the officer having seen the Derringer, if that sentence is completely eliminated from the affidavit, there is still sufficient probable cause stated in the affidavit to justify a warrant. The affidavit says that Ms. Crowder had gone there to purchase drugs, which she had done previously. The affidavit says that the officers saw marijuana, cocaine, packaged in multiple separate baggies, Oxycontin, drug paraphernalia, and a state of Tennessee cosmetology license issued to Mr. Estes with the illegal drugs that was [sic] concealed outside the residence under Mr. Estes' vehicle.

It's my ruling that that was in plain view. The officers had a right to be in that driveway. And it's apparent from the photographs that an officer in the driveway could clearly see those items in plain view without opening the trunk or without opening a car door or without opening a shed door. Any officer could have easily seen those. Even if the officer were looking for contraband, this, in my judgment, was in plain view and certainly, coupled with Ms. Crowder's statement that she had been to the house to buy drugs and that she had done so previously, is sufficient probable cause for Judge Morgan to have issued the search warrant.

Based on the valid search warrant, the Court finds that the guns that were later discovered are admissible as a result of the fact that they were found during the execution of a lawful search warrant.

This oral ruling was then memorialized in an order filed on February 13, 2008.

This court reviews the district court's factual findings for clear error and its application of law *de novo*. *United States v. Loney*, 331 F.3d 516, 520 (6th Cir. 2003). Furthermore, "we review all evidence in a light most favorable to the Government." *Id.* (quoting *United States v. Galloway*, 316 F.3d 624, 628 (6th Cir. 2003)).

It is not surprising that defendant has shifted his position somewhat since first filing his motion to suppress evidence. In his original motion, defendant focused exclusively on the initial search of the residence as a violation of the Fourth Amendment. No mention was made of the discovery of the tray containing drug-related evidence except by implication, namely, that "all evidence seized as a result of that entry [into the residence] should be suppressed as fruit of the poisonous tree." Motion to Suppress, November 30, 2007 at 4. However, while an officer needs either a warrant or probable cause to justify the search of a residence, no such requirement exists when an officer observes incriminating evidence in plain view outside of the residence. As the district court put it, "[I]t's apparent from the photographs that an officer in the driveway could

- 4 -

clearly see those items in plain view without opening the trunk or without opening a car door or without opening a shed door."

As he must, in his brief to this court, defendant makes the argument that the officers could only have observed the tray containing drug-related items by violating the "curtilage" of his property, a point he arguably forfeited by failing to raise it explicitly below. Because it is a close issue, we will extend defense counsel the benefit of the doubt and assume that he raised this argument by implication.

Unquestionably, the Fourth Amendment extends protection to the "curtilage" of one's house. *United States v. Jenkins*, 124 F.3d 768, 772 (6th Cir. 1997). In *Jenkins*, we looked to *United States v. Dunn*, 480 U.S. 294, 301 (1987), for guidance in defining what constitutes curtilage. The Court suggested the following considerations should factor into the analysis:

> Drawing upon the Court's own cases and the cumulative experience of the lower courts that have grappled with the task of defining the extent of a home's curtilage, we believe that curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. We do not suggest that combining these factors produces a finely tuned formula that, when mechanically applied, yields a "correct" answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration – whether the area in question is so intimately tied to the home itself that it should be placed under the home's "umbrella" of Fourth Amendment protection.

*Dunn*, 480 U.S. at 301 (citations and footnote omitted).

Looking to the testimony and exhibits introduced during the suppression hearing, defendant points out that his backyard was surrounded by a fence. In *Horton v. California*, 496 U.S. 128 (1990), the Court stated that it is "an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *Id.* at 136. The incriminating character of the evidence must be immediately apparent and the officer must have a lawful "right of access" to it. *Id.* at 136-37.

Defendant also contends that it was not immediately apparent that the evidence was incriminating. We have tried to pin down the phrase "immediately apparent" by suggesting that the following factors be considered:

> This Court has long deliberated what "immediately apparent" means. We summarized the factors used in many of our prior cases in *United States v. Beal*, 810 F.2d 574, 576-577 (6th Cir. 1987). We found that while none of these factors is necessary, they are instructive as to what this court has used to find that the criminality of a piece of evidence was "immediately apparent." *Id.* The factors include 1) "a nexus between the seized object and the items particularized in the search warrant," 2) "whether the 'intrinsic nature' or appearance of the seized object gives probable cause to believe that it is associated with criminal activity," and 3) whether "the executing officers can *at the time* of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature." *Id.* (internal citations omitted) (emphasis in original).

*United States v. McLevain*, 310 F.3d 434, 441 (6th Cir. 2002). Defendant stresses that officer Falacho never testified that it was immediately apparent to him that the tray contained drugs and drug paraphernalia – he simply saw a tray in the dark.

When we consider the photographs of defendant's house and its adjacent driveway, which is next to an alley, at least three of the factors mentioned in *Dunn* undercut a finding that the driveway represents curtilage: first, the area was not enclosed; second, defendant had not taken any steps "to protect the area from observation by people passing by;" third, it was used as a point of entry into the residence, accessible from the adjacent alley. *See Dunn*, 480 U.S. at 301. Whether or not the officers entered the backyard first is of no consequence if the officers had a legitimate right to be in the driveway. Defense counsel himself conceded during the suppression hearing that "officers can certainly walk up to houses and knock on their doors . . . and if . . . they see something in plain view that's inherently incriminating, they can seize it . . . ." That is what happened here. The police were legitimately in defendant's driveway investigating an assault, they observed a tray in plain view, and they seized it. While the testimony of officer Falacho is equivocal concerning precisely when he saw the tray, he stated unequivocally that it was in plain view. We review for clear error and our independent review of the transcript of the suppression hearing convinces us that the evidence was sufficient on this point to support the district court's factual finding that the tray was in plain view.

We turn briefly to defendant's contention that it was not immediately apparent that the tray was "inherently incriminating." While a tray in the abstract may not be "inherently incriminating," a tray placed behind the wheel of a car at a residence where officers had been told that drug trafficking occurred earlier in the evening is inherently worthy of a closer look. Moreover, officer Falacho testified that Crowder had told them that defendant used a tray in connection with his drug trafficking. As we mentioned in *McLevain*, part of the inquiry into whether it is "immediately

apparent" that an item is inherently incriminating is whether "the executing officers can *at the time* of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature." *McLevain*, 310 F.3d at 441 (quoting *United States v. Beal*, 810 F.2d 574, 576-77 (6th Cir. 1987)). Here the officers' knowledge that a tray was used in trafficking coupled with its placement behind the wheel of a car is more than sufficient to meet the "immediately apparent" requirement.

The judgment is **affirmed**.